IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Criminal Case No. 08-161-CG |
| | ) |
| PAMELA PYLE. | ) |

## ORDER

This matter is before the court on the unopposed petition of the defendant, Pamela Pyle ("Pyle" or "Dr. Pyle") for a writ of error coram nobis. (Doc. 28); see also Doc. 30. For the reasons enumerated below, Dr. Pyle's petition is hereby **GRANTED**.

## FACTUAL BACKGROUND

Because it is unopposed, the court accepts the factual background contained in Dr. Pyle's petition. (Doc. 28-1 at 3-12). In summary, Dr. Pyle has practiced internal medicine in the state of South Carolina for approximately 20 years. (Doc. 28-11 at 2). In early 2005, Pyle developed an interest in anti-aging medicine and began communicating with James Abernathy, the owner of an anti-aging practice in California. (Doc. 28-1 at 4). Abernathy and Pyle began a professional relationship in which Abernathy travelled to South Carolina to train Pyle and her staff and provided her with written materials. Id. Pyle and Abernathy also entered into a one-year agreement whereby Pyle agreed to purchase certain supplements and human growth hormone from Abernathy through March 2006. Id. Upon the termination of their one-year agreement in

1

March 2006, Abernathy emailed Pyle and requested that she temporarily write steroid prescriptions for his patients. Doc. 28-2 at 3; see also Doc. 28-11 at 3. Abernathy represented to Pyle that (1) the patients receiving the prescriptions had undergone or would undergo a physical examination; (2) that the prescriptions were medically necessary; (3) that it was legal for Pyle to write the steroid prescriptions in this manner; and (4) that Abernathy risked losing his business if Pyle did not write the prescriptions. (Doc. 28-2 at 3-4). Abernathy also sent Pyle documents containing the patients' diagnostic codes, blood values, and drug recommendations. Id. Ultimately, Pyle prescribed steroids for 18 of Abernathy's patients without personally examining them, and without personally investigating the legality of doing so. See id. In July 2006, Pyle discontinued this practice over Abernathy's objections. Id.

In August 2006, Pyle was confronted by DEA agents about her work with Abernathy. Id. She immediately admitted her involvement and proceeded to give valuable assistance to the government by submitting to DEA debriefing sessions and by providing the government with her laptop computer, which contained information that implicated several steroid traffickers. (Doc. 28-5 at 2). Pyle offered this assistance without obtaining immunity from prosecution, and later testified for the government at the trials of 10 defendants. (Doc. 28-1 at 2, 5). The government later stated that Dr. Pyle "made an excellent, credible witness," and that "never once did [she] attempt to minimize her criminal conduct. (Doc. 28-5 at 3).

Upon the advice of counsel, Pyle pleaded guilty to one felony count of misprision of a felony. (Doc. 28-4 at 3). At her sentencing, Dr. Pyle's guideline offense level was a 4, with no criminal history, resulting in a sentencing range of 0-6 months. Id. Notwithstanding this sentencing range, the government filed a § 5K1.1 motion for downward departure to credit Pyle's "substantial assistance" and the fact that her testimony "provided crucial evidence." (Doc. 28-5 at 3).

Pyle's former defense attorney advised her regarding her guilty plea. (Doc. 28-4 at 4). Pyle expressed to that her ability to continue her medical practice "was a critical component of any acceptable plea agreement." Id. Pyle also "sought assurances that a conviction for misprision of a felony would not result in an automatic revocation or suspension of her license to practice medicine." Id. Her attorney states that he advised Pyle that "her ability to practice medicine would be controlled by the South Carolina Medical Board… I understood that the misprision plea would not automatically trigger any mandatory revocation or suspension of her license." Id. In fact, after Pyle's conviction, the South Carolina Board of Medical Examiners held disciplinary proceedings October 7, 2009, and determined that a public reprimand and assessment of costs was the appropriate sanction. (Doc. 28-11 at 4-5). Within days of completing her one year of probation, Pyle reapplied for and regained an unrestricted DEA license, permitting her once again to write prescriptions for patients. (Doc. 28-2 at 7).

Her former defense attorney now admits, however, that he did not advise Pyle that by accepting the plea, her resulting conviction would trigger a mandatory exclusion from participation in federal health care programs pursuant to 42 U.S.C. § 1320a-7(a)(4). Id. Notwithstanding her attorney's assurances that pleading guilty would not negatively impact her ability to practice medicine, Pyle received a letter dated March 22, 2012, from the Office of Inspector General ("OIG") of the United States Department of Health and Human Services ("HHS") informing her that her 2008 conviction triggered a mandatory five-year exclusion "from eligibility to participate in any capacity in the Medicare, Medicaid, and **all** Federal health care programs" (the "five-year exclusion"). (Doc. 28-12 at 2). The letter notes that "[g]enerally speaking, [Dr. Pyle] could not be employed by a hospital, nursing home [or] other provider or supplier that participates in Federal health care." Id. Consequently, her former defense attorney asserts that he has "no doubt that Dr. Pyle pled guilty with the mistaken understanding that her conviction would not automatically bar her from the practice of medicine." Id.

To cast further light on the OIG's letter, Dr. Pyle attached to her petition the declaration of Laurence Freedman, a Washington, D.C., attorney whom she retained and who specializes in health care investigations and proceedings. (Doc. 28-13). Freedman stated that he had several conversations with Peter Clark, the Exclusions Staff Director at the HHS OIG, in which he learned that: (1) Dr. Pyle's exclusion is mandatory under 42 U.S.C. § 1320a-7(a)(4); (2) the

4

exclusion period must be five years; (3) neither the Secretary of HHS nor any administrative law judges may exercise discretion and reduce the exclusion period; (4) HHS OIG cannot retroactively apply the exclusion period to a time before Dr. Pyle's 2008 guilty plea; and (5) HHS OIG will begin the exclusion period on September 5, 2012, unless this court vacates her conviction, or defense counsel, working with the United States Attorney's Office for the Southern District of Alabama, demonstrates a high likelihood of Pyle's sentence being vacated. Id. at 3.

## LEGAL ANALYSIS

The power to grant a writ of error coram nobis comes from the all-writs section of the Judiciary Act of 1789, 28 U.S.C. § 1651(a). U.S. v. Morgan, 346 U.S. 502, 506 (1954). It is an "extraordinary remedy," to be granted "only under circumstances compelling such action to achieve justice." Id. Courts may consider coram nobis petitions only where no other remedy is available and the petitioner presents sound reasons for failing to seek relief earlier. U.S. v. Mills, 221 F.3d 1201, 1204 (11th Cir. 2000).

Here, the requirements for the court to consider Pyle's petition are met. She is not (and never was) in custody, thus obviating a habeas corpus petition under 28 U.S.C. § 2255. United States v. Peter, 310 F.3d 709, 712 (11th Cir. 2002). Secondly, Pyle asserts that the HHS OIG letter advising her of her exclusion under 42 U.S.C. § 1320a-7(a)(4) was the first opportunity for her to seek relief. (Doc. 28-1 at 21-22) (citing Peter at 711).

5

Turning to the substance of the petition, Pyle argues that her former defense attorney's failure to apprise her of the potential collateral sanction of the five-year exclusion period constituted ineffective assistance of counsel. (Doc. 28-1 at 13). Framing that error as one of omission, Pyle cites <u>Padilla v. Kentucky</u>, 130 S. Ct. 1474, 1484 (2010), for the proposition that counsel may be found ineffective at the plea stage for both affirmative misrepresentations and omissions. Although <u>Padilla</u> dealt with counsel's obligation to advise his client about the collateral risk of deportation after a guilty plea, Pyle argues that the same logic is applicable here, where her attorney failed to advise her of the risk of the five-year exclusion period. Pyle asserts that there is no principled reason that <u>Padilla</u>'s holding should not apply to her case. (Doc. 28-1 at 18). However, Eleventh Circuit case law holds that <u>Padilla</u> is a new rule that does not apply retroactively. <u>Sarria v. U.S.</u>, 2011 WL 4949724, *5 (S.D. Fla. 2011). Accordingly, the court declines to apply <u>Padilla</u> to her 2008 guilty plea and conviction.

Nevertheless, based upon the declarations of both the former defense attorney and Pyle, the court finds that the <u>Padilla</u> analysis is not necessary in this case. Although Pyle did inquire about the effects of a guilty plea on her ability to practice medicine, which she considered "a critical component of any acceptable plea agreement," (Doc. 28-4 at 4), her defense counsel engaged in an affirmative misrepresentation when, by his own admission, he told her that "her ability to practice medicine would be controlled by the South Carolina Medical

6

Board." (Doc. 28-4 at 4). This clearly was incorrect, as the five-year exclusion period would be no less of an encumbrance on Pyle's ability to practice medicine than having her medical license revoked by the South Carolina Medical Board.

The defense counsel's admission thus reveals a failure on his part to meet the critical obligation of counsel to advise [Pyle] of "the advantages and disadvantages of a plea agreement." Libretti v. United States, 516 U.S. 29, 50-51 (1995). Such obligation "arises not from a specific duty to advise of the automatic exclusion, but rather from the more fundamental principle that attorneys must inform themselves of material legal principles that may significantly impact the particular circumstances of their clients." United States v. Manocchio, 1994 U.S. Dist. LEXIS 21442, *39 (S.D. Fla. 1994).

## CONCLUSION

Therefore, under the circumstances described above and for the reasons enumerated above, the court concludes that Dr. Pyle has established that her counsel's failure to investigate the range of prospective civil collateral consequences and to advise her of such prospective consequences, fell below an objective standard of reasonableness. See Manocchio at *40. The court also concludes that a five-year exclusion from federal health care programs would cause Pyle to suffer actual and substantial prejudice as a result of assistance by counsel that fell below an objective standard of reasonableness. See id. at *43-44. Accordingly, Dr. Pyle's petition for a writ of error coram nobis is hereby **GRANTED**.

7

The judgment of conviction in this case is accordingly **VACATED**.

**DONE** and **ORDERED** this 28th day of August 2012.

>	/s/  Callie V. S. Granade
>	UNITED STATES DISTRICT JUDGE